IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

GLENDA B. DYER                                                         PETITIONER
ADC #706589

V.                                 NO. 5:04cv00137 SWW-JWC

LARRY NORRIS, Director,                                              RESPONDENT
Arkansas Department of Correction

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following recommended disposition has been sent to United States District

Court Judge Susan Webber Wright.  Any party may serve and file written objections to this

recommendation.  Objections should be specific and should include the factual or legal

basis for the objection.  If the objection is to a factual finding, specifically identify that

finding and the evidence that supports your objection.  An original and two copies of your

objections must be received in the office of the United States District Court Clerk no later

than eleven (11) days from the date of the findings and recommendations.  The copy will

be furnished to the opposing party.   Failure to file timely objections may result in waiver

of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different,

or additional evidence, and to have a hearing for this purpose before the District Judge,

you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence proffered at the hearing before the District Judge  (if such
        a  hearing is granted)  was not  offered at  the hearing before the Magistrate
        Judge.

3.      The detail of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite 402
Little Rock, AR 72201-3325

## RECOMMENDED DISPOSITION

Glenda B. Dyer, an Arkansas Department of Correction inmate, brings this 28 U.S.C. § 2254 petition for writ of habeas corpus, along with a supporting brief (docket entries #2, #7). By previous order (docket entry #28), Grounds 2 and 4 were dismissed at the request of Petitioner (*see* docket entry #26). For the reasons that follow, Petitioner's remaining claims should be dismissed as well.

I.
Background

On December 4, 1998, Petitioner's husband was killed by a rifle shot to the neck in the driveway of their residence in Horatio, Arkansas. The police investigation began to focus on Petitioner and Steven Swim, a man who worked with her. On February 1, 1999, Swim attempted suicide by drug overdose. On March 3, 1999, he was scheduled to take a polygraph examination regarding the murder. He never showed, and the next day his

body was discovered near his home.  He had committed suicide by a shotgun blast to the chest.  He left a note, saying he could not take the pressure anymore.

Petitioner was subsequently arrested for the murder of her husband.  She was tried before a jury in September 1999 in Pike County Circuit Court.  At the trial, a coworker testified that she overheard Petitioner telling Swim that she wished she knew someone that could kill her husband, and Swim said he "might know somebody" who could help her. Other witnesses testified that Petitioner had asked about how to kill her husband with "poison, pesticides and things like that," and had said that the only way she could get out of her marriage was if her husband was dead.  Petitioner's three daughters testified that she made numerous other threats and statements about killing their father and her desire to be rid of him.  One daughter testified about an incident when her father collapsed and required hospitalization after drinking a glass of iced tea prepared by Petitioner.

The trial evidence also showed that, about one month before the murder, Swim somehow obtained possession of one of the victim's hunting rifles.  Ballistics evidence and other testimony linked the missing rifle to a spent cartridge found at the murder scene. Swim's wife, Silvia, testified that, at about the same time as Swim obtained the rifle, he told her not to worry about money because a woman in her forties would "bring you some money," about $15,000.  When Silvia asked why, Swim told her she would hear about it on the radio.  She said Swim later told her the woman was Petitioner.  Swim's stepson, David Swim, testified that Swim told him a blonde lady in her forties would bring them a bag of money, $10,000 to $15,000.  When the stepson asked why, Swim told him "something about being a hit man."

Coworkers testified that Petitioner and Swim were not at work during the time of the murder, and other witnesses saw Petitioner and a man who looked like Swim in her truck that afternoon.  There was evidence that a truck like Petitioner's was driving toward Petitioner's house that afternoon and away from the residence a short time later, and one neighbor heard a gunshot in the interim.

After Swim's suicide, Silvia Swim went to the police and told them about the statements Swim had made to her and her son regarding the money he said Petitioner would bring them.  At the direction of the police, Silvia contacted Petitioner.  During one conversation, Silvia told Petitioner that her son, David, "knows everything" about the murder.  Silvia testified that Petitioner became very upset and said, "David knows?"  Silvia testified that Petitioner gave her $240 and assured her she would give them some more, but could not get any insurance money until her name was cleared.  According to Silvia, Petitioner said, "If I go down, there is no money."

One of Petitioner's daughters testified that, after Swim's suicide, the daughter began to suspect that Petitioner put him up to committing the murder.  One day, in front of three other people, the daughter asked Petitioner, "How did you get Steven to kill our dad?"  According to the daughter, Petitioner never denied playing a part in her husband's murder and instead responded that she did not do anything her daughters did not want done.

The jury convicted Petitioner of first-degree murder and sentenced her to life imprisonment.  (R. 1579-80.)[1]  In a direct appeal to the Arkansas Supreme Court,

---

[1]All references to the record are to the nine-volume record of Petitioner's trial court proceedings, as submitted in her direct state-court appeal, and filed here as Resp't Ex. 1.  Unless otherwise indicated, Respondent's exhibits are part of docket entry #33.

Petitioner raised the following claims: the trial court erred (1) in admitting statements made by her alleged accomplice (Steven Swim) before he killed himself, (2) in denying a continuance for the purpose of obtaining an independent mental evaluation, and (3) in admitting testimony from several witnesses who described Petitioner's prior threats to kill her husband.  (Resp't Ex. 2, at vii.)  Finding no error, the Arkansas Supreme Court affirmed.  *Dyer v. State*, 36 S.W.3d 724 (Ark. 2001) (Resp't Ex. 3).

Petitioner then filed in state court a petition for post-conviction relief pursuant to Ark. R. Crim. P. 37, alleging: (1) she was denied the effective assistance of trial and appellate counsel; (2) she was convicted of a charge not made, in violation of due process; (3) prosecutorial misconduct; (4) she was deprived of a fair and impartial trial; and (5) she was denied her right to conflict-free appellate counsel.  (Resp't Ex. 4, at 10-19.)  Following an evidentiary hearing where Petitioner was represented by counsel, the petition was denied. *Dyer v. State*, No. CR-99-31 (Pike Co. Cir. Ct.  Nov. 8, 2001) (Resp't Ex. 4, at 24-28).  She raised one issue on appeal: ineffective assistance of counsel for failing to present mitigating evidence at sentencing to show that the victim previously had abused Petitioner. (Resp't Ex. 5, at 49-52.)  The Arkansas Supreme Court affirmed the denial.  *Dyer v. State*, No. CR 02-581, 2003 WL 1860276 (Ark. Sup. Ct. Apr. 10, 2003) (Resp't Ex. 6). There is no evidence or allegation that Petitioner sought any further relief in state court.

Petitioner then filed this federal habeas petition, advancing the following claims:

      1.      She is actually innocent of the crime for which she was convicted, and the evidence against her was insufficient to establish her guilt;

      2.      The trial court was without jurisdiction to try her because the change of venue from Sevier County to Pike County violated state law;

3.      The prosecution concealed evidence that a witness (Silvia Swim) was offered inducements to testify against Petitioner;

4.      The prosecution failed to corroborate accomplice statements in compliance with state law, and counsel was ineffective for failing to argue this point; and

5.      The state courts improperly applied Ark. R. Evid. 801(d)(2)(v) in admitting statements made by Petitioner's alleged accomplice, and counsel was ineffective in failing to argue this point.

Respondent filed a motion to dismiss (docket entry #11), asserting that the petition should be dismissed without prejudice so that Petitioner could return to state court to exhaust still available remedies as to Grounds 2 and 4.  To assist Petitioner in responding and determining how best to proceed, counsel was appointed to represent her (docket entry #13).  Counsel filed a response on Petitioner's behalf, stating that he had researched the viability of the unexhausted claims and discussed his conclusions in great detail with Petitioner (docket entry #26).  As a result, Petitioner moved to withdraw the unexhausted claims and proceed in federal court only with the remaining exhausted claims. Respondent's motion to dismiss was thus granted as to Grounds 2 and 4 (docket entry #28), and, at the Court's direction, he filed a response to Grounds 1, 3 and 5 (docket entry #31).  Respondent asserts that, with the exception of part of Ground 5, all of the remaining claims are procedurally defaulted because Petitioner failed to first present them to the state courts.  *See Coleman v. Thompson*, 501 U.S. 722 (1991).[2]  Although notified of her opportunity to respond to this argument (docket entries #32, #35, #37), Petitioner has not done so and the time for responding has expired.

---

[2]Respondent concedes that the exhaustion requirement is met as to these claims because any further efforts in state court regarding them would be futile.  *See id.* at 732.

II.

Procedural Default

Before seeking federal habeas review, a state prisoner must first fairly present the substance of each claim to each appropriate state court, thereby alerting those courts to the federal nature of his claims and giving them an opportunity to pass upon and correct any constitutional errors made there. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *see* 28 U.S.C. § 2254(b) & (c) (requiring federal habeas petitioner to pursue all remedies available in the state courts). A federal habeas petitioner's claims must rely on the "same factual and legal bases" relied on in state court. *Interiano v. Dormire*, 471 F.3d 854, 856 (8th Cir. 2006). Claims in a federal habeas petition that were not presented in state court and for which there is no remaining state court remedy are procedurally defaulted. *Id.* Failure to appeal the denial of a post-conviction claim to the highest state court constitutes a procedural default. *Osborne v. Purkett*, 411 F.3d 911, 919 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 1569 (2006).

Where a procedural default has occurred, federal habeas review is permitted only if the petitioner can demonstrate (1) cause for the default <u>and</u> actual prejudice as a result of the alleged violation of federal law, or (2) that failure to consider the claims will result in a fundamental miscarriage of justice, that is, that a constitutional violation has resulted in the conviction and continued incarceration of one who is actually innocent. *Coleman*, 501 U.S. at 750; *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Cause requires a showing of some impediment, external to the defense, preventing a petitioner from presenting or developing the factual or legal basis of a claim. *Murray*, 477 U.S. at 488-89, 492. Pro se status and unfamiliarity with legal arguments and procedural matters are not sufficiently

7

external to constitute cause excusing a procedural default. *Smittie v. Lockhart*, 843 F.2d

295, 298 (8th Cir. 1988). If no cause has been shown, the prejudice element need not be

addressed. *McCleskey v. Zant*, 499 U.S. 467, 502 (1991).

### III.
### Ground 1

In her first claim, Petitioner argues that she is "actually innocent" because the

evidence presented at trial was insufficient to convict her (docket entry #2, at 5).

To the extent Petitioner is attempting to raise a free-standing claim of actual

innocence, she cannot prevail for two reasons. First, in a noncapital case such as this, an

assertion of actual innocence is "not itself a constitutional claim, but instead a gateway

through which a habeas petitioner must pass to have his otherwise barred constitutional

claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). *See Schlup*

*v. Delo*, 513 U.S. 298, 313-17 (1995); *Mansfield v. Dormire*, 202 F.3d 1018, 1023-24 (8th

Cir. 2000).

Secondly, if this is construed as a challenge to the sufficiency of the evidence

arising under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (holding that trial evidence is

constitutionally insufficient to convict only if "no rational trier of fact could have found proof

of guilt beyond a reasonable doubt"), the claim is procedurally barred. Petitioner has never

presented this claim in state court, and she offers no reason for failing to do so. As stated,

the default cannot be excused by Petitioner's own unfamiliarity with the applicable law or

procedures. Moreover, the omission cannot be excused due to the inaction of her trial,

appellate or post-conviction attorneys. While ineffective assistance of trial or appellate

8

counsel may constitute cause to lift a procedural bar, *Murray*, 477 U.S. at 488; *Williams v. Kemna*, 311 F.3d 895, 897 (8th Cir. 2002), a habeas petitioner cannot rely upon ineffectiveness of counsel as cause to excuse a procedural default where he has not properly presented that ineffectiveness claim to the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (ineffective assistance of counsel asserted as cause for procedural default of another federal claim can itself be procedurally defaulted); *Interiano*, 471 F.3d at 856-57; *Williams*, 311 F.3d at 897. Here, Petitioner presented several claims of ineffective assistance in her Rule 37 petition, but she only advanced one claim in her Rule 37 appeal, regarding counsel's failure to present mitigating evidence at sentencing. Any other ineffective-assistance claims are procedurally defaulted.  In addition, because there is no constitutional entitlement to counsel in state post-conviction proceedings, she cannot blame her Rule 37 attorney for any default that occurred there. *Coleman*, 501 U.S. at 752, 757; *Interiano*, 471 F.3d at 856-57.

Nor has she demonstrated a gateway claim of actual innocence that is sufficient to overcome her procedural default.  To fit within this narrow "fundamental miscarriage of justice" exception to the cause-prejudice requirement, a habeas petitioner must (1) support her allegations of constitutional error with new reliable evidence not presented at trial and (2) show, in light of the new evidence, "that it is more likely than not that 'no reasonable juror' would have convicted [her]." *Schlup*, 513 U.S. at 324, 329.  "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Id.* at 316; *see Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir.) (exception requires petitioner "to present new evidence that affirmatively

demonstrates that he is innocent of the crime for which he was convicted"), *cert. denied*, 127 S. Ct. 590 (2006); *Osborne*, 411 F.3d at 920 (evidence not "new" if existed at time of trial and could have been discovered earlier if petitioner or counsel had diligently pursued it); *Nance v. Norris*, 392 F.3d 284, 291 (8th Cir. 2004) (no actual-innocence showing with information that was available at trial, on direct appeal and throughout post-conviction proceedings), *cert. denied*, 126 S. Ct. 133 (2005).

In support of her actual-innocence claim, Petitioner asserts only that her conviction was based "solely on circumstantial evidence," referring to weaknesses in some of the evidence that was introduced against her.[3]  She points to no new evidence that would permit her to invoke the miscarriage-of-justice exception, much less anything affirmatively demonstrating her factual innocence.  The exception is inapplicable.

Ground 1 should be dismissed.

## IV.
## Ground 3

In this claim, Petitioner alleges the prosecution concealed that it had promised "a deal and reward" to its key witness, Silvia Swim, in exchange for her testimony, resulting in a due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).  According to Petitioner, the allegedly undisclosed "deal" was that, if Silvia provided information and incriminating testimony against Petitioner, the state would assist Silvia and her children in avoiding deportation and obtaining permanent citizenship, and also promised her a posted reward of $10,000.

---

[3](1) Her extramarital affairs; (2) her alleged comments that she wished the victim were dead; and (3) alleged comments made by her accomplice to his wife and stepson.

*Brady* held that due process is violated where the prosecution has suppressed evidence favorable to an accused, if the evidence is material either to guilt or to punishment. *Brady*, 373 U.S. at 87; *see Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) (evidence can be favorable because it is exculpatory or has impeachment value). *Giglio* held that, when the reliability of a witness's testimony may well be determinative of the guilt or innocence of a defendant, due process requires the prosecutor to disclose any promises of leniency made to that witness in exchange for testimony. *Giglio*, 405 U.S. at 153-55.

Like Ground 1, Petitioner has never presented this claim in state court. As cause, she asserts that her default should be excused because she did not learn of the alleged prosecutorial misconduct until after trial. The Court agrees with the general principle that a habeas petitioner can establish cause for a procedural default where the reason for her failure to develop facts in state-court proceedings was the state's suppression of the relevant evidence. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). Furthermore, an external impediment meeting the cause requirement can be "the reasonable unavailability of the factual basis for the claim." *McCleskey*, 499 U.S. at 497.

Petitioner has not demonstrated the existence of cause. Other than her bare allegations, she presents no evidence that the prosecutor promised to Silvia the alleged deal (assistance with obtaining permanent citizenship, in exchange for testimony) or the posted reward. The record shows that, before Petitioner's trial, her counsel filed a motion for discovery, specifically requesting disclosure of any "inducements, coercion or promises" made to any potential witness by the prosecutor or any investigative agencies. (R. 14.) The prosecutor turned over hundreds of pages of discovery matter, supplementing its response several times, and none of the materials suggests that promises or inducements

of any type were made to Silvia or anyone else.  (R. 2-3, 16-42, 46-1408, 1418-37, 1439-41, 1475-83, 1493-97.)  The materials include Silvia's interviews and other interactions with various law enforcement officials.  (R. 229-37, 326-27, 354, 979-81, 991-93, 997, 1013-17, 1097-1100, 1423-34, 1441, 1477-78, 1481-83.)  When testifying at the Rule 37 post-conviction hearing, Petitioner's trial counsel testified that he believed the state had turned over everything in its possession.  (Resp't Ex. 4, at 48, 74.)

Nothing in the trial testimony of Silvia or any of the law enforcement officers involved suggests that any promises were made to her or that any inducements by officers prompted her to implicate Petitioner.  She testified that she had been trying to obtain her citizenship for more than six years, which is very expensive because "you need lawyers [and] you need to pay the immigration."  (R. 2426-27, 2462)  She testified that, after the December murder, she wondered if her husband had been talking about Petitioner when he had said the previous month that a woman in her forties would be bringing them some money.  She said she "had that feeling" that he was involved in the murder, especially after his first suicide attempt in February, but that he would not directly answer her questions.  She said that, after her husband's suicide in March, she went to her lawyer and asked him to go to the police with her and her son to tell them about Swim's earlier statements.  She said that, once there, they discussed the matter and she agreed to cooperate with the police by going to Petitioner and asking for "the money what she promised my husband."  (R. 2448-50.)  Upon cross-examination by defense counsel, Silvia acknowledged that, before she went to the police, she saw a poster advertising a $10,000 reward for information leading to the arrest or conviction of whomever was responsible for the victim's death.  She denied that the posted reward was the reason she decided to go to the police

and implicate Petitioner.  She further testified that she did not intend to seek the reward.
(R. 2488-89.)

At no point in her testimony did Silvia suggest that the police or the prosecutors had
promised to help her obtain citizenship in exchange for her cooperation or her testimony,
nor was she asked about this on cross-examination by Petitioner's counsel.  Similarly,
although defense counsel brought out the fact that a reward existed and his line of
questioning intimated that the reward might have prompted Silvia to go to the police, he did
not pursue the issue any further.  Moreover, none of the officers involved suggested that
any promises were made to Silvia, nor were they cross-examined about this.

In February 2000 — just a few months after Petitioner's trial and while her direct
appeal was pending – Silvia filed a complaint against the victim's estate to collect the
$10,000 posted reward.  (Resp't Ex. 3 to docket entry #31.)  This complaint was against
members of the victim's family only, did not name any prosecutors or law enforcement
officials as defendants, and did not allege that her entitlement to the reward was based on
any promises made by any prosecutors or officials.  Judgment was entered in Silvia's favor
in February 2001, directing that the reward money be released to her.  (Resp't Ex. 4 to
docket entry #31.)

Shortly thereafter, newspaper articles were published about Silvia's frustrations in
trying to obtain citizenship.  (Resp't Ex. 1 & 2 to docket entry #31.)  The articles appeared
in the *Little River News* (a local newspaper) in March 2001, and in the *Arkansas Democrat-Gazette* (a statewide newspaper) in April 2001.[4]  The articles state that the sheriff and

---

[4] *The Informant's Plight*, Little River News (Ashdown, Ark.), Mar. 22, 2001; Rodney Bowers,
*German Seeks Way to Stay in America after Husband Dies*, Arkansas Democrat-Gazette, Apr. 30,

prosecutor helped extend Silvia's work permit for two years so she could remain in the United States for Petitioner's trial and appeal, and that they believed a strong argument could be made that the case would not have been solved without her.  Other than that, the articles refer only to *post-appeal* attempts by the prosecutor to help Silvia avoid deportation in appreciation for her help.  The articles in no way suggest that any pretrial commitment or promise of assistance was made, nor did Silvia or her sons, in their litany of reported complaints about the citizenship process, mention any type of promise or inducement by the prosecutor or any law enforcement officials.

In short, nothing in the record supports Petitioner's contentions that, in exchange for Silvia's testimony, the prosecutor promised to help her and her sons obtain permanent citizenship, promised her the $10,000 posted reward, and then concealed and intentionally failed to disclose these promises to Petitioner in violation of *Giglio* or *Brady*.  *See Middleton v. Roper*, 455 F.3d 838, 853-54 (8th Cir. 2006) (no due process violation established from sequence of events surrounding witness where petitioner "points to no evidence, beyond mere speculation, of an undisclosed deal offered by the prosecution"), *cert. denied*, 127 S. Ct. 980 (2007); *Moore-El v. Luebbers*, 446 F.3d 890, 900 (8th Cir.) (witness's "nebulous expectation of help from the state" in exchange for testimony is not *Brady* material), *cert. denied*, 127 S. Ct. 673 (2006).

The newspaper articles do state that the prosecutor obtained an extension of Silvia's work permit so that she could stay in the United States through Petitioner's trial and direct appeal.  This necessarily would have been done before trial.  Assuming this is an

---

2001.

"inducement" that was not disclosed prior to Silvia's testimony, Petitioner has not shown that, with reasonable diligence, she could not have discovered that an extension had been obtained.  As stated, Silvia clearly testified about her desire to obtain citizenship, her "immigration problem," and her agreement to cooperate with the police in investigating Petitioner.  Defense counsel could have explored this area on cross-examination, but chose not to do so.  Furthermore, Petitioner was alerted to the existence of a permit extension through the newspaper articles in March and April 2001, giving her ample time to include any related claims in her state Rule 37 post-conviction petition filed on April 26, 2001.  Similarly, Silvia's complaint against the victim's estate to collect the $10,000 reward, and the order releasing the funds to Silvia, were filed as public records long before initiation of any state post-conviction proceedings.[5]

In her pro se Rule 37 petition, Petitioner raised a claim of prosecutorial misconduct regarding the alleged suppression of evidence of the victim's "violence and abuse" toward her.  (Resp't Ex. 4, at 15.)  She also alleged in the petition that her trial counsel was ineffective for, among other things, failing to show "why Steven Swim's wife, an alien immigrant, would deliberately lie so that she could remain in the United States." (*Id.* at 18.)  This indicates an awareness of a potential claim regarding Silvia's testimony.  However, Petitioner never alleged  – as she now does – that Silvia's testimony was somehow connected to improper promises or inducements by the prosecutor or law enforcement officials.  She did not allege that the prosecutor's efforts in obtaining a work extension, as

---

[5]Although not mentioned by the parties, newspaper articles also reported Silvia's claim for the reward.  *Widow's Reward Claim in Killing Likely Settled*, Arkansas-Democrat Gazette, Apr. 26, 2000 (abstract accessible at http://library.ardemgaz.com).

reported in the media, were not disclosed to her before trial.  She did not allege that the

$10,000 reward was promised to Silvia, that Silvia testified falsely when she said she did

not intend to seek the reward, or that her testimony was contradicted by her later complaint

against the victim's estate.   None of these specific areas was explored or developed

through an amended petition or at the post-conviction hearing, where Petitioner was

represented by counsel.[6]  Nor did Petitioner ever file a petition for writ of *error coram nobis*

claiming prosecutorial suppression of impeachment evidence.  *See Echols v. State*, 201

S.W.3d 890, 894 (Ark. 2005) (*coram nobis* petition available to address claims of material

evidence being withheld by prosecutor); *see also Collier v. Norris*, Nos. 06-2519/2630,

2007 WL 1109311 (8th Cir. Apr. 16, 2007) (federal habeas court reviewed state-court Rule

37 and *coram nobis* proceedings based on allegation that state suppressed certain

impeachment evidence, *i.e.*, that one law enforcement officer gave witness $300 and

another promised him $10,000 reward in exchange for witness's trial testimony).

Petitioner states that she did not discover the alleged prosecutorial misconduct until

"after trial," but she does not say when this occurred or even exactly what she discovered

that made her believe a *Brady/Giglio* violation had occurred.  As shown above, she has

failed to demonstrate that, had she exercised reasonable diligence, she could not have

raised the general basis for such a claim at the appropriate time in her state court

proceedings.  "If what petitioner knows or could discover upon reasonable investigation

supports a claim for relief in a federal habeas petition, what he does not know is irrelevant.

---

[6]A few days after Petitioner filed her Rule 37 petition, counsel entered an appearance on her behalf, stating his intention to file an amended petition after further investigation and research. (Resp't Ex. 4, at 20.)  The record does not contain any amendments or supporting briefs.

Omission of the claim will not be excused merely because evidence discovered later might also have supported or strengthened the claim." *McCleskey*, 499 U.S. at 498.

Petitioner's claims as raised in Ground 3 are procedurally defaulted, and she has not met the cause-prejudice requirement.  Moreover, the actual-innocence exception is inapplicable.  The only arguably "new" items of evidence in the record are (1) the newspaper articles stating that the prosecutor and sheriff helped Silvia Swim obtain an extension of her work permit for Petitioner's trial and direct appeal, and (2) Silvia's filing of a complaint to recover the $10,000 posted reward, contradicting her trial testimony that she did not intend to seek the reward.  None of this evidence would establish Petitioner's factual innocence of murdering her husband, but rather would present additional matters for a jury to consider in assessing the credibility of Silvia's testimony, in light of the other evidence supporting guilt.  Where new evidence would simply set up a "swearing match" among witnesses, it does not establish that no reasonable juror could have credited the testimony of the state's witnesses and found the petitioner guilty beyond a reasonable doubt.  *Moore-El*, 446 F.3d at 903; *see also Cox v. Burger*, 398 F.3d 1025, 1031 (8th Cir.) (no actual-innocence claim where recantation would only serve to potentially impeach credibility of other witnesses, but could not prove petitioner did not shoot the victim), *cert. denied*, 126 S. Ct. 93 (2005); *Morris v. Dormire*, 217 F.3d 556, 559-60 (8th Cir. 2000) (evidence did not show actual innocence where only tended to impeach and was cumulative); *Allen v. Nix*, 55 F.3d 414, 417 (8th Cir. 1995) (exception inapplicable where evidence only tended to impeach other testimony and only indirectly supported the petitioner's version of facts).

Ground 3 should be dismissed as procedurally barred.

V.
Ground 5

In this claim, Petitioner argues that the trial court erred in admitting into evidence as non-hearsay, pursuant to Ark. R. Evid. 801(d)(2)(v), the following statements allegedly made by Steven Swim less than a month before the murder: (1) Swim's statement to his wife, Silvia, that a woman in her forties would be bringing Silvia $10,000 to $15,000, and that Silvia would hear about it on the radio; and (2) Swim's statement to his stepson, David, that a blond woman in her forties would be bringing them a bag of money and "something about being a hit-man."

The trial court admitted Swim's statements under Rule 801(d)(2)(v) as being statements by a coconspirator made in the course of and in furtherance of the conspiracy. (R. 2418-20.)  In Petitioner's direct appeal, she challenged the trial court's findings.  The Arkansas Supreme Court stated:

> Rule 801(d)(2)(v) provides that a statement is not hearsay if it is offered against a party and it is a statement by a coconspirator of a party made during the course and in furtherance of the conspiracy. Before such statements can be admitted, the State must make a prima facie showing that a conspiracy existed between the declarant and the defendant. *See Spears v. State*, 905 S.W.2d 828 ([Ark.] 1995); *Dixon v. State*, 839 S.W.2d 173 ([Ark.] 1992); *Smithey v. State*, 602 S.W.2d 676 ([Ark.] 1980). The statements themselves may be considered along with other independent evidence in determining the existence of a conspiracy. *Haire v. State*, 8 S.W.3d 468 ([Ark.] 2000) (citing *Bourjaily [v. United States*, 483 U.S. 171 (1987)]). The sufficiency of the evidence of a conspiracy is a preliminary matter decided by the trial court.  *Spears*, 905 S.W.2d 828.  As with any other evidentiary matter, we will not reverse the trial court's ruling absent an abuse of discretion.  *Gaines v. State*, 8 S.W.3d 547 ([Ark.] 2000).

*Dyer*, 36 S.W.3d at 726 (footnote & parallel citations omitted).

The supreme court went on to find that, in light of the trial evidence, the trial court did not err in finding prima facie evidence of a conspiracy between Petitioner and Swim to kill the victim, Bill Dyer.  Specifically, in addition to the contested statements by Swim to his wife and stepson, the court noted the following evidence: Petitioner and Swim worked together; a coworker overheard Petitioner tell Swim she wished she knew someone that could kill her husband and Swim say he might know someone; Petitioner had made numerous threats and statements regarding her desire to be rid of her husband; Swim was in possession of a rifle like the one that killed the victim; on the afternoon of the murder, Petitioner and Swim were not at work, Petitioner was seen with a passenger who looked like Swim, a truck like Petitioner's was seen going toward and coming from her residence, and a gunshot was heard in the interim; when the police investigation began to focus on Swim, he attempted suicide, then successfully killed himself a month later; when asked by her daughter how Petitioner got Swim to kill the victim, Petitioner said she did not do anything her daughters did not want done; the conversations between Silvia and Petitioner following Swim's suicide; and the fact that Petitioner was the beneficiary of the victim's insurance policies.  *Id.* at 726-29.

The supreme court also concluded that Swim's statements were made during the course and in furtherance of the conspiracy, explaining:

> In the first place, the statements were made during the course of the conspiracy, as they were made prior to Dyer's death, sometime during November 1998. This is near the time that Swim obtained possession of Dyer's rifle and was overheard talking to Appellant about killing her husband.
>
> In the second place, the statements were made in furtherance of the conspiracy.  Although this court has had few opportunities to discuss the "in furtherance of" element of Rule 801(d)(2)(v), it has held that statements designed to further the specific objective of the conspiracy are made in

furtherance of the conspiracy.  *Dixon*, 839 S.W.2d 173.  Federal cases interpreting the corresponding federal rule of evidence hold that this requirement should be interpreted broadly.  *See [United States v.] Cordova*, 157 F.3d 587 [(8th Cir. 1998)]; *United States v. Edwards*, 994 F.2d 417 (8th Cir. 1993).  Thus, statements that have an overall effect of facilitating the conspiracy or that somehow advance the objectives of the conspiracy are said to be in furtherance of the conspiracy.  *Id.*; *United States v. Garcia*, 893 F.2d 188 (8th Cir. 1990).  Statements that identify a fellow conspirator are also considered to be in furtherance of the conspiracy.  *Id.* (citing *United States v. Handy*, 668 F.2d 407 (8th Cir. 1982)).  Moreover, statements that are designed to enlist a third party's assistance or to induce the listener's aid in achieving some objective of the conspiracy meet the "in furtherance of" requirement.  *Id.* (citing *United States v. Bentley*, 706 F.2d 1498 (8th Cir. 1983)).

Appellant relies heavily on the case of *Leach v. State*, 831 S.W.2d 615 ([Ark. Ct. App.] 1992), in which the court of appeals held that statements made by a coconspirator to his wife, who was not part of the conspiracy, were not admissible under Rule 801(d)(2)(v).  *Leach* relied primarily on two federal cases, *United States v. Wood*, 834 F.2d 1382 (8th Cir. 1987), and *United States v. Eubanks*, 591 F.2d 513 (9th Cir. 1979).  Those cases held that statements made by a coconspirator to his wife were not made in furtherance of the conspiracy where the statements were nothing more than a report of the coconspirator's activities or casual admissions of culpability.  While we do not dispute the legitimacy of these holdings, we conclude that the present case is distinguishable.

Here, the statements made by Swim to his wife, Silvia, and stepson, David, may be viewed as being designed to enlist their assistance or to induce their aid in achieving one of the objectives of the conspiracy, namely the receipt of payment from Appellant for Swim's role as a hit man.  Notably, Swim's statement to his wife was that a woman in her forties, later identified by him as Appellant, would bring "you," meaning Silvia, some money.  Similarly, the statement to David was that the money would be brought to "us," meaning the family.  Thus, the statements had the effect of involving Silvia and David in the conspiracy, as far as collecting payment for Swim's participation.  Accordingly, we cannot say that the trial court abused its discretion in finding that the statements were made during the course and in furtherance of the conspiracy to kill Bill Dyer.

*Dyer*, 36 S.W.3d at 728-29 (parallel citations and history omitted).

In her federal habeas claim, Petitioner presents four different sub-claims.  First, she

argues that, because she was charged as an accomplice of Swim, rather than a

coconspirator, the trial court erred in finding Swim's statements admissible as those of a coconspirator (docket entry #2, at 14-18).  Second, Petitioner argues that Swim's out-of-court statements were inadmissible hearsay because they did not fall within the exception to the hearsay rule set out in Ark. R. Evid. 804(b)(3) (docket entries #2, at 18-19; #7, at 12-13).  Third, Petitioner contends that Swim's statements were not made "in the course of" or "in furtherance of" a conspiracy (docket entries #2, at 19-27; #7, at 8-22).  The final argument is that any statements made after the murder were inadmissible because the criminal act had culminated and was over (docket entries #2, at 27; #7, at 21).  Petitioner also asserts, apparently in connection with all four sub-claims, that trial counsel was ineffective in failing to make these particular arguments.

Except for the third sub-claim, none of these specific arguments was raised in state court.  While Petitioner blames her attorneys, this cannot constitute cause because, as explained earlier, any such ineffective-assistance claims are themselves procedurally defaulted.  Nor has she alleged the existence of any new evidence demonstrating her actual innocence.  Therefore, federal review of the first, second and fourth sub-claims is procedurally barred.

A careful reading of Petitioner's pleadings shows her specific arguments regarding the remaining sub-claim to be as follows.  First, Petitioner says that Swim's statements were inadmissible as statements of a coconspirator under Ark. R. Evid. 801(d)(2)(v) because they were not made "in the course of" a conspiracy.  Recounting weaknesses and inconsistencies in the evidence, Petitioner says it was insufficient to show the existence of a conspiracy between Petitioner and Swim.  She says "much suspicion is heaped on the

Petitioner, and much of it is heaped onto Swim, but there is no linkage of the two." (*See* docket entries #2, at 19-25; #7, at 13-19.)

Second, Petitioner says that, even if a conspiracy existed, the evidence does not show that Swim's statements were made "in furtherance of" that conspiracy. She says Swim's statements to Silvia and David were not made to induce action by coconspirators but were simply "narratives and idle chatter" as to what transpired in the conspiracy and to inform them of what Swim hoped would happen. In support, Petitioner cites the Arkansas Court of Appeals' decision in *Leach v. State*, *supra*, other state cases,[7] and several federal court of appeals cases.[8] (*See* docket entries #2, at 25-27; #7, at 19-22.)

These are essentially the same arguments presented to, and rejected by, the Arkansas Supreme Court in Petitioner's direct appeal. In the interests of finality and federalism, a federal habeas court is constrained by statute to exercise only a "limited and deferential review of underlying state court decisions." *Evenstad v. Carlson*, 470 F.3d 777, 781-82 (8th Cir. 2006). Where a state court has previously adjudicated a claim on the merits, a federal habeas court may grant habeas relief for the same claim in only three limited situations: where the state court adjudication (1) was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); **or** (2) "involved an unreasonable application" of clearly established

---

[7] *Henderson v. State*, 953 S.W.2d 26 (Ark. 1997); *Dixon v. State*, 839 S.W.2d 173 (Ark. 1992); *Brazel v. State*, 759 S.W.2d 28 (Ark. 1988); *Hendrickson v. State*, 688 S.W.2d 295 (Ark. 1985); *Williams v. State*, 645 S.W.3d 697 (Ark. Ct. App. 1983).

[8] *United States v. LiCausi*, 167 F.3d 36 (1st Cir. 1999); *United States v. Johnson*, 927 F.2d 999 (7th Cir. 1991); *United States v. Wood*, 834 F.2d 1382 (8th Cir. 1987); *United States v. Fielding*, 645 F.2d 719 (9th Cir. 1981); *United States v. Eubanks*, 591 F.2d 513 (9th Cir. 1979).

federal law, id.; **or** (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

No contention is made regarding the state court's characterization of the underlying facts, making § 2254(d)(2) inapplicable. Additionally, Petitioner admits that the state courts stated the correct law, but says they did not apply it correctly to the facts (docket entry #2, at 14). Therefore, the only question for this Court is whether the Arkansas Supreme Court's determination that the statements were admissible was an unreasonable application of any clearly established federal law. The Court finds that it was not.

Questions regarding admissibility of evidence are matters of state law. *Garcia v. Mathes*, 474 F.3d 1014, 1017 (8th Cir. 2007). It is not the province of a federal habeas court to reexamine state-court determinations on state-law issues. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Instead, the admission of evidence at a state trial will form the basis for federal habeas relief only if the state court's evidentiary rulings "infringe on a specific constitutional protection or are so prejudicial as to amount to a denial of due process." *Garcia*, 474 F.3d at 1017. A habeas petitioner must show the alleged improprieties "were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." *Id.* The United States Supreme Court has "very narrowly" defined the category of infractions that violate the due process test of fundamental fairness. *Dowling v. United States*, 493 U.S. 342, 352 (1990).

Therefore, to the extent Petitioner is arguing that the state trial court erroneously admitted Swim's statements pursuant to state evidentiary rules or that the state supreme court erroneously applied state law in reviewing the evidentiary issues on appeal, this Court cannot further review her claim. Furthermore, the Court is not aware of any clearly

established United States Supreme Court precedent holding that admission of a coconspirator's statement under the circumstances present here constitutes a violation of due process, and Petitioner has not identified any relevant Supreme Court law that she thinks the Arkansas courts acted contrary to or applied unreasonably. *See Evenstad*, 470 F.3d at 783 (to obtain habeas relief, petitioner "must be able to point to the Supreme Court precedent he thinks the ... state courts acted contrary to or applied unreasonably"). The state and federal court of appeals cases cited by Petitioner do not constitute "clearly established Federal law, as determined by the Supreme Court," as required by § 2254(d). *Id.* at 782-83.  Petitioner does contend that the admission of Swim's statements was contrary to *Wong Sun v. United States*, 371 U.S. 471 (1963) (docket entry #7, at 8-10, 22),[9] referring to *Wong Sun*'s holding that out-of-court "post-conspiracy declarations" by a coconspirator may not be used against an accused because they are not made during and in furtherance of the conspiracy. *Id.* at 490-91.  However, the only statements at issue in this sub-claim – and the only statements contested in Petitioner's direct appeal – were those that Swim made to his wife and stepson in the month before the murder. *See Dyer*, 36 S.W.3d at 726 (collectively, "that a blonde woman in her forties would bring them some money, $10,000 to $15,000, as payment for Swim's role as a hit man").  Arguments about statements made after the murder are procedurally defaulted, as those were not presented to the state courts.

Moreover, the state courts' determination that Swim's contested statements to his wife and stepson were made "in the course of" and "in furtherance of" a conspiracy did not

---

[9]It is unclear whether *Wong Sun* was cited to support Petitioner's third sub-claim or his defaulted fourth-subclaim.

24

render Petitioner's state-court proceedings fundamentally unfair.  The conclusion that a conspiracy existed was reasonable in light of the recited evidence linking Petitioner and Swim to the victim's murder, as was the conclusion that the statements were made to Silvia and David "in furtherance of" that conspiracy because they were "designed to enlist their assistance or to induce their aid in achieving one of the objectives of the conspiracy, namely the receipt of payment from [Petitioner] for Swim's role as a hit man."  *Dyer*, 36 S.W.3d at 728-29.  Petitioner was permitted to litigate the evidentiary issues at trial and on appeal, with both courts articulating a reasoned basis for admissibility.  *Id.* at 726-29.  (R. 2412-20.)  Petitioner was not restricted from pointing out weaknesses in the evidence connecting Petitioner and Swim, in impeaching the credibility of Silvia and David's testimony as to what Swim allegedly told them, or in otherwise alleviating the impact of Swim's statements.  For example, Silvia testified at one point that her husband told her before his death that the "woman in her forties" was Petitioner, but, on further questioning, defense counsel was able to get her to admit that she "assumed" the woman was Petitioner because of other things her husband had said.  (R. 2476, 2482-83, 2489-90.)  Petitioner's counsel pointed out this discrepancy in his closing argument.  (R. 2643.)  Under these circumstances, the state courts' evidentiary ruling was not of such magnitude as to fatally infect the state proceedings and deprive Petitioner of due process.

In summary, Ground 5 should be dismissed in its entirety because any specific challenges to the admissibility of Swim's statements which were not litigated before the Arkansas courts are procedurally barred, this Court lacks authority to second-guess the Arkansas Supreme Court's interpretation and application of its own evidentiary law, and Petitioner has not demonstrated that the Arkansas Supreme Court's decision regarding

25

admissibility was contrary to or an unreasonable application of any United States Supreme Court precedent.

## VI.
### Conclusion

This 28 U.S.C. § 2254 petition for writ of habeas corpus (docket entry #2) should be dismissed in its entirety.  Grounds 2 and 4 should be dismissed without prejudice as previously ordered (docket entry #28), and Grounds 1, 3 and 5 should be dismissed with prejudice for the reasons stated above.

DATED this 8th day of May, 2007.


UNITED STATES MAGISTRATE JUDGE